**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE:<br><br>THE IT GROUP, INC., et al.<br><br>Debtors. | ) | Chapter 11<br><br>Case No. 02-10118 (MFW)<br>Jointly Administered |
| INTEGRATED WATER RESOURCES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SHAW ENVIRONMENTAL, INC., and ALIXPARTNERS LLC, as Trustee of the IT LITIGATION TRUST<br><br>Defendants. | ) | Adversary No. 06-50785 (MFW) |

**OPINION**[1]

Before the Court is the Motion of Integrated Water Resources, Inc. ("IWR") for summary judgment in its complaint against Shaw Environmental Inc. ("Shaw") seeking a declaratory judgment that Shaw has no claim against IWR.[2] For the reasons set forth below, the Court will grant the motion.

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[2] IWR does not seek summary judgment on its claims that, if Shaw has a claim against IWR, the IT Litigation Trust (the "IT Trust") has breached a settlement agreement with IWR and must indemnify it. IWR states that it will dismiss its claims against the IT Trust if it is successful in its action against Shaw.

I. BACKGROUND

In April 2001, IWR was a subcontractor to a prime contractor to the United States. IWR retained the IT Group, Inc. (the "Debtor") as a sub-subcontractor to perform environmental remediation of government facilities in Cape Canaveral, Florida. The Debtor and IWR executed a Subcontractor Agreement (the "Cape Canaveral Contract") on October 17, 2001, setting forth the details of the project.

On January 16, 2002 (the "Petition Date"), the Debtor and several of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

On January 23, 2002, the Debtors and Shaw entered into an Asset Purchase Agreement (the "APA"), wherein Shaw agreed to purchase substantially all the Debtors' assets. The sale was subject to Court approval after consideration of higher and better bids that might be submitted.

As part of the sale process, on March 15, 2002, the Debtors served IWR with a Notice of Amounts Necessary to Cure Defaults Under Contracts and Leases Proposed to be Assumed and Assigned to The Shaw Group Inc. or a Successful Bidder (the "Cure Notice"). On April 12, 2002, IWR filed a limited objection to the Cure Notice in which IWR opposed the assumption and assignment of the Cape Canaveral Contract because the Contract involved specialized

expertise of an unusual nature. Further, in both the limited objection and its accompanying declaration, IWR alleged that the Debtors had materially breached the Cape Canaveral Contract by failing to perform certain tasks at critical points. On April 17, 2002, the Debtors served IWR with a Revised Notice (the "Revised Notice") informing IWR that the Debtors did not intend to assume and assign any of IWR's contracts to Shaw.[3]

On April 25, 2002, the Court entered an Order Approving the APA and Authorizing (I) Sale of Substantially All of Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (II) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Assumption of Certain Liabilities (the "Sale Order"). The Sale Order excluded from assumption and assignment to Shaw "any executory contract or unexpired lease to which an Objector . . . is a party." (Sale Order ¶ 12.) The Objectors, including IWR, were listed on an exhibit attached to the Sale Order. (Sale Order Ex. D.) Shaw and the Debtors closed the sale on May 3, 2002.

On November 12, 2002, Shaw sent IWR a demand for payment of an account receivable totaling $387,345 arising under the Cape Canaveral Contract (the "Cape Canaveral Receivable"). On November 18, 2002, IWR replied that the Cape Canaveral Contract

---

[3] IWR was also a party to a Joint Marketing Agreement (the "JMA") with the Debtors.

was excluded from the Sale Order and, therefore, the Cape Canaveral Receivable was not assigned to Shaw. Shaw did not respond.

The Debtors' Plan of Reorganization was confirmed on April 6, 2004, and became effective on April 30, 2004. Pursuant to the Plan, the IT Trust was created to liquidate the remaining assets of the estate for the benefit of creditors.

On July 18, 2005, the IT Trust and IWR executed a Settlement Stipulation, which resolved the proof of claim filed by IWR in the amount of $1 million for the alleged breach of the JMA. The Settlement Stipulation also contained general releases, whereby IWR and the IT Trust relinquished "any and all judgments, claims, demands, actions, debts, controversies, damages, and causes of action whatsoever, of any kind or nature, whether known or unknown, or suspected or unsuspected, which the Trustee and the Debtors [and IWR] and each of them now own, hold, held, had or claimed to have." (Settlement Stipulation ¶ 3.) The Settlement Stipulation was approved by the Court on July 19, 2005.

Thereafter, on October 27, 2005, Shaw filed a complaint against IWR in the Superior Court of California, seeking $387,345 for the "completed sub-contract receivable assigned by [the Debtors] to [Shaw]" stemming from the Cape Canaveral Contract. (Cal. Compl. ¶ 11.)

On July 24, 2006, IWR commenced this adversary proceeding against Shaw to enjoin the California action, contending that Shaw has no claims against IWR, particularly under the Cape Canaveral Contract. Alternatively, IWR seeks indemnification from the IT Trust, should this Court find that the Cape Canaveral Contract or the Cape Canaveral Receivable was transferred to Shaw by the Sale Order. On August 16, 2006, the Court granted IWR's Motion for Preliminary Injunction, and the California action was stayed pending a determination of the validity of Shaw's claim to the Cape Canaveral Receivable.

IWR was granted leave to file an Amended Complaint, which it did on March 20, 2007. On March 30, 2007, Shaw filed its answer to the Amended Complaint and a counterclaim for a determination that the Cape Canaveral Receivable was "properly assigned to Shaw." (Shaw Countercl. ¶ 9.) Shaw further sought a judgment on the Cape Canaveral Receivable in the amount requested in the California action.

On June 29, 2007, IWR filed the instant motion for summary judgment. Shaw opposes the motion. Briefing on the motion is complete, and the matter is now ripe for decision.

## II. JURISDICTION

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 & 157(b)(1).

This is a core matter. 28 U.S.C. § 157(b)(2)(A), (B), (L), (N), & (O).

## III. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must review all the evidence and “draw all reasonable inferences in favor of the non-moving party.” Fields v. Thompson Printing Co., 363 F.3d 259, 265 (3d Cir. 2004). The moving party bears the burden of establishing that no genuine issue of material fact exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986). A fact is material when it could “affect the outcome of the suit.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the moving party establishes the absence of a material fact, the non-moving party must present facts demonstrating that there is a “genuine issue for trial.” Matsushita, 475 U.S. at 587. “Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no ‘genuine issue for trial’” and summary judgment may be granted. Id. (citations omitted).

B. Sale of the Contract

IWR asserts that it does not owe anything to Shaw under the Cape Canaveral Contract because that Contract was specifically excluded from the Sale Order. (Sale Order ¶ 12.) IWR further contends that the Settlement Stipulation executed between IWR and the IT Trust released all claims the IT Trust or the Debtors had against IWR, including any claims relating to the Cape Canaveral Contract. (Settlement Stipulation ¶ 3.)

Shaw disagrees, arguing that the Debtors' obligations under the Cape Canaveral Contract were substantially complete at the time of the Sale Order. As a result, Shaw contends that the Cape Canaveral Receivable was a "Completed Contract Receivable" that was transferred to Shaw as an "Asset" under the Sale Order. In the alternative, Shaw asserts that even if the Cape Canaveral Contract was not completed, the Receivable was transferred to Shaw as an Accounts Receivable. Shaw further argues that the IT Trust was unable to release IWR from its payment obligations under the Cape Canaveral Contract in the Settlement Stipulation, because the Cape Canaveral Receivable had already been transferred to Shaw in the Sale Order.

1. Completed Contract versus Executory Contract

Shaw relies on the terms of the APA, which specified that the "Assets" transferred to Shaw included "Completed Contracts Receivable," defined by the APA as "all Accounts Receivable

related to Completed Contracts." (APA 2, 5.) "Completed Contracts" were defined as "Contracts of Sellers . . . under which substantially all of the contractual work effort of Sellers has been completed, even if such Contracts have continuing warranty obligations, administrative matters or work related to warranty or other claims." (APA 4-5.) Thus, Shaw contends that the Cape Canaveral Contract was a "Completed Contract," the Receivable of which was sold to Shaw.

The Court disagrees. Shaw's argument that the Cape Canaveral Contract was completed is undermined by the fact that both the Cure Notice and the Revised Notice issued by the Debtors to IWR stated that IWR's contracts were executory. Moreover, the Revised Notice, which informed IWR that its contracts were not being assumed and assigned to Shaw, advised IWR that its contracts were executory and that the rights and obligations outstanding on them were not being transferred to Shaw. Finally, the Sale Order itself treated the Cape Canaveral Contract as executory, and one not being assigned to Shaw, a characterization to which Shaw did not object.

2. <u>Sale Order Exclusion</u>

Even if the Cape Canaveral Contract was a Completed Contract, it was not assigned to Shaw. The Sale Order states that "[t]o the extent any provision of the [APA] is inconsistent with the terms of this Sale Order, the terms of this Sale Order

shall govern." (Sale Order ¶ 41.) The Sale Order expressly excluded IWR's contracts from being assumed and assigned to Shaw. (Sale Order ¶ 12, Ex. D.) Thus, even if the Cape Canaveral Contract was included in the APA as an "Asset," its exclusion in the Sale Order means the APA and the Sale Order are inconsistent. By the terms of the Sale Order, the Sale Order governs.

Even in the absence of that express language in the Sale Order, the Sale Order terms would govern. It is a "fundamental axiom of contract interpretation that specific provisions control general provisions." Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp., 289 F.3d 373, 377 (5th Cir. 2002). In addition, "a subsequent specification impliedly limits the meaning of a preceding generalization." Affiliated Food Distribs., Inc. v. Local Union No. 229, 483 F.2d 418, 420 (3d Cir. 1973) (citations omitted). Thus, the Court finds that the Sale Order's subsequent express exclusion of the Cape Canaveral Contract from the assumption and assignment of contracts to Shaw controls over the APA's general definition of "Assets" purchased by Shaw.

3. Settlement Stipulation

In addition to the specific exclusion of the Cape Canaveral Contract from the Sale Order, the Settlement Stipulation confirms that neither that Contract nor claims or receivables related to it were sold to Shaw. In the Settlement Stipulation, the IT

Trust represented that “neither the Trustee nor the Debtors have assigned any claim against IWR.” (Settlement Stipulation ¶ 10.) This is consistent with the Sale Order, which states that the contracts of IWR, including the Cape Canaveral Contract, were not assigned to Shaw.

4. Allegations of Breach of Contract

Further evidence of the invalidity of Shaw’s contention that the Cape Canaveral Contract was a “Completed Contract” are IWR’s allegations of breach. Shaw concedes that “there are genuine issues of material fact regarding whether the Cape Canaveral Contract was a ‘Completed Contract’ as defined in the APA.” While there may be a dispute over the status of the Contract as completed or executory, IWR’s allegations that the Debtor was in breach of the Contract point to a conclusion that the Contract was not, as Shaw argues, “substantially completed” at the time of the sale. Moreover, whether the Contract was in fact breached or completed is not a determination that the Court must make in order to rule on IWR’s instant motion. Because the Cape Canaveral Contract was specifically excluded from the Sale Order, questions of breach or obligations outstanding are irrelevant.

C. Transfer of the Cape Canaveral Receivable

Shaw alternatively asserts that “even if the Court were to conclude that the Cape Canaveral Contract was not a ‘Completed Contract,’ the Cape Canaveral Receivable would nevertheless still

constitute an ‘Accounts Receivable’ and therefore part of the Assets transferred to Shaw.” In essence, Shaw contends that even if the Cape Canaveral Contract was an excluded contract under the Sale Order, Shaw bought the Receivable of that Contract independent of the Contract itself.

The Court does not find this to be the case. First, as noted, the Sale Order expressly excluded the Cape Canaveral Contract from the sale. Contrary to what Shaw suggests, the exclusion provision of the Sale Order did not function to exclude only some of the claims associated with the contracts of the Objectors, it excluded those contracts in their entirety from the sale. Therefore, exclusion of the Cape Canaveral Contract from the Sale Order had an effect beyond that of merely preserving IWR’s objection to assumption and assignment. Rather, the exclusion operated just as the Sale Order indicated - to exclude “contracts held by the Objectors listed on Exhibit D.” (Sale Order 2 n.2.)

At the Sale Hearing held on April 25, 2002, counsel for the Debtors confirmed the breadth of the exclusion by stating that, for parties indicated on Exhibit D, “their contracts or their assets are not affected by this order.” (Hr’g Tr. 8:8-9, Apr. 25, 2002.) Shaw’s counsel was present at the hearing and did not object to this characterization. Thus, the Court concludes that the Cape Canaveral Contract and any “assets” related to it

(including the Cape Canaveral Receivable) were excluded from the sale to Shaw by virtue of the express language of the Sale Order.

Further support for the Court's conclusion is the fact that IWR received no notice of any intent of the Debtors to sell IWR's Account Receivable under the Sale Order. Indeed, the only notice pertaining to the sale that IWR received was the initial Cure Notice and the subsequent Revised Notice. The latter informed IWR that its contracts would not be assumed and assigned to Shaw. Thus, IWR had no notice that the Cape Canaveral Receivable was being sold to Shaw.

Even the provisions of the APA do not support Shaw's argument. Whereas Shaw emphasizes the extensive scope of the term "Assets," Shaw neglects to note that the APA defines the term "Excluded Assets" to encompass "Excluded Contracts," which are "all Contracts other than Completed Contracts and Immaterial Contracts (i) which are designated as such on Schedule 5.15(b) . . . or (ii) which are not listed on Schedule 3.17." (APA 6, 14.) The Cape Canaveral Contract was not listed on Schedule 5.15(b) or 3.17. Consequently, the Contract was an "Excluded" one under the APA. By the terms of the APA, "all Accounts Receivable related to Excluded Contracts" were "Excluded Contracts Receivable" and therefore "not a part of the sale and purchase contemplated by [the APA] and . . . [consequently] excluded from the Assets." (APA 6, 14.)

Thus, for the reasons set forth above, the Court concludes that the Cape Canaveral Receivable was neither a Completed Contract Receivable nor an Accounts Receivable sold to Shaw.

D. <u>Validity of the Settlement Stipulation</u>

IWR contends that the Settlement Stipulation executed between IWR and the IT Trust operated to resolve and release all claims between the Debtors and IWR, including those related to the Cape Canaveral Contract.

Shaw argues that the IT Trust was unable to waive the Cape Canaveral Receivable because it had previously been transferred to Shaw under the Sale Order. In addition, Shaw asserts that IWR and the IT Trust failed to provide Shaw with notice of the Settlement Stipulation or include Shaw in negotiation and resolution of the claims arising from the Cape Canaveral Contract and Receivable. As a result, Shaw argues, the Settlement Stipulation is ineffective against Shaw.

As discussed above, the Court finds that the Cape Canaveral Contract and Receivable were specifically excluded by the Sale Order and the APA from the sale to Shaw. Consequently, the Court concludes that IWR and the IT Trust were free to resolve the issues and claims remaining between them as of confirmation - including the Cape Canaveral Contract and Receivable. Shaw's contention that it did not have notice of the Settlement Stipulation is irrelevant because Shaw had no interest in the

settlement negotiations and agreements between IWR and the IT Trust.

Thus, the Court concludes that the Settlement Stipulation between IWR and the IT Trust is valid with respect to all claims relating to the Cape Canaveral Contract.

## IV. CONCLUSION

For the reasons set forth above, the Court will grant IWR's motion for summary judgment.

An appropriate order is attached.

BY THE COURT:

Dated: October 31, 2007

Mary F. Walrath
United States Bankruptcy Judge